### COLE v. COLE.

Circuit Court, Dade County.

February 26, 1953.

92

Clements & Clements, Miami, for plaintiff.
William E. Hagearty, Miami, for defendant.

VINCENT C. GIBLIN, Circuit Judge.

The plaintiff wife is eighteen years younger than the defendant husband. He is fifty-nine years of age and she forty-one. A little more than twelve years ago they met, on the streets of Miami, without formal introduction, at a time when he was sojourning here awaiting the entry of a decree by which he should be divorced from a former spouse. They engaged in illicit intercourse during the first evening of their acquaintance, and, within a day or two, his abode became hers. The meretricious relations continued here until, after he had obtained the desired divorce, they went together to Washington, D. C., where he resumed the active management of his furniture business. There they lived together in fornication for about two years and until she joined a church and was suddenly seized with scruples of a strange sort. Their separation, however, was short-lived. Within a year they were ceremonially married in

Washington and shortly thereafter (in January, 1944) they became permanent residents of Miami.

Throughout the two years of premarital illicitness, and for more than five years after the legalization of their cohabitation, they engaged, if her own admissions are to be given credence, in sexuality of the unnatural kind discreetly described by Mr. Justice Thomas in his opinion in Fine v. State, (Fla.), 14 So. 2d 408. If her testimony is to be believed, they were both guilty, because of their abominable and detestable indulgence, of violations of our criminal code (sections 800.01 and 800.02, Florida Statutes 1951). Her participation, she says, was voluntary and productive of orgastic culmination. Their marital relations were harmonious, she states, until her religiosity and the increasing intensity of the pangs of conscience induced her to abandon the abnormal sexual practices to which both of them had been so long addicted. She assigns, as the cause and source of discord, her ultimate declination, after more than five years of domestic serenity, to accede to his entreaties that they revert to perversion. Her refusal, she complains, led to his sarcastic, contemptuous and offensive criticism of her religion (to which he attributed her deviation from the bedroom activities to which he had become accustomed) and to her understandable emotional distress and unhappiness.

Frankness impels me to a blunt expression of my utter lack of confidence in the plaintiff's veracity. She has used a weapon all too frequently employed in this and other courts by designing and venomous women to bludgeon recalcitrant husbands into submission to their financial demands. I have not been without opportunity to observe her and her demeanor on the witness stand. She was before me and testified in support of her application for interlocutory financial relief; and a previous order evidences her failure to impress me as she did the master. I am not unaware, however, of the possibility that the able and conscientious master may be right and I wrong. He may be a better judge of human nature than I. The need for the asserted reformation of the plaintiff may have existed, as she would have the court believe, and it may have occurred, as she vows; but if so, her current virtue must be its own reward, because, even if I should accept her testimony as wholly true, I could not tolerate her emergence from this litigation with the monetary awards which the master recommends that she be given.

I shall not discuss the defendant's counterclaim (in which he too prays for a divorce) or the evidence adduced in support of it. I think there is no need for such discussion. There is ample evidentiary basis for the entry of a decree by which the bonds of

matrimony shall be dissolved. The Supreme Court, in Diem v. Diem, 193 So. 65, Bergman v. Bergman, 199 So. 920, McGee v. McGee, 5 So. 2d 49, Loomis v. Loomis, 20 So. 2d 125, and Garland v. Garland, 29 So. 2d 693, and other cases, has established modern and sensible standards by which the conduct and attitudes of the parties to this suit should be gauged. The testimony makes it obvious, I think, that the difference in age, their divergent religious views, their loss of conjugal compatibility and their conflicting traits and habits are causes of mental torture to each. Their views as to the duties and obligations imposed by the marriage contract are so at variance that there is no common ground on which their differences can be fused. They had reached the point, at the time of their separation, that the conduct and attitude of each occasioned extreme annoyance and distraction to the other. The resumption by them of the relationship of husband and wife would, I am sure, subject them both to extreme mental cruelty. Both are at fault and it is not necessary for me to decide which is more to blame. The dissolution of the bonds of matrimony will be not only of benefit to the parties, but to society as well. They will be divorced each from the other.

The plaintiff is forty-one years of age and is in good health. She is an undergraduate nurse. Before her marriage she had had employment as a practical nurse and limited experience as a typist and bookkeeper. She is, as the master observes, well qualified as an office assistant and can earn at least fifty dollars a week. Her husband has given her the interest she holds in income-producing business property which they now own as an estate by the entireties and which, on the entry of this decree, they will own as tenants in common. Her half-interest is of a market value of approximately $15,000. If the property is not to be sold (and I will not order its sale in this suit unless both parties agree) she will be entitled to one-half of the net rental income which (after the deduction of her share of necessary mortgage payments and other expenses) will approximate $90 a month and will increase as the mortgage indebtedness is reduced. Because of her earning capacity and her financial status, and for the reasons I have expressed in this decree, she will be awarded no alimony.

The master recommends that the defendant be required to pay to the plaintiff's attorneys, as compensation for the services rendered in this suit in their client's behalf, a fee approximating $5,000. I find, after a careful study of the record, that $3,000 (in addition to the $250 already paid to such attorneys by the defendant) would reasonably and adequately compensate them for such services.

The master reports that he expended thirty-two hours in hearings and an equal amount of time in considering the testimony, in reading and studying cited authorities, in conducting an independent research, and in preparing his report. It is my opinion and holding that $650 is a reasonable fee to be allowed the master for his services. This expense would have been obviated had there been no reference. Because of my desire to relieve litigants of the expense (which is so frequently enormous) incident to the reference of equity causes to masters, I have made no reference of any chancery suit in my division (except in two cases in each of which a detailed and prolonged accounting was required) since June 30, 1952. The only legitimate excuse for a judge's delegation of a part of his judicial duties and responsibilities to a master is that, because of the press of other and more important matters, the chancellor is unable, without undue delay, to do what he directs the master to do. If the judge can do it he should do it, because he is being compensated by the state and the county to do all that he reasonably can do in providing a "just, speedy and inexpensive determination of every action" assigned to him for disposition. There are, of course, exceptional cases in which the appointment of a master and the expense incident to such appointment are justified, but references have become the rule rather than the exception, and the abuse has resulted in an indefensible system of patronage in which lawyers are awarded fees by judges for doing what the judges themselves ought to do. I confess that at the outset of my incumbency, before I found, through experience, that the volume of work assigned to me was not so great that I could not try equity suits, as well as law actions, I became for a time an acquiescent participant in the system because I deemed references a necessity. We are too prone to regard as right that which has been customarily done for a long period of time, without investigation into its merits or demerits. Now that I have made such investigation, I think the time has come for some of us who know the evils of the prevailing system to expose them. The abandonment of the system will result in the saving of hundreds of thousands of dollars to litigants in equity suits. It is with apology, therefore, that in this case I burden one of the litigants with the expense occasioned by the reference.

My views and rulings on the exceptions of both parties to the master's report are evidenced by this opinion and decree; and it will not be necessary to enter a separate order on such exceptions.

It is ordered and decreed (a) that the bonds of matrimony between the plaintiff, Elinor V. Cole, and the defendant, Edmund M. Cole, be and they are, hereby dissolved and that such parties be,

and they are, hereby divorced, each from the other; and (b) that the defendant be, and he is, hereby required to pay immediately to Messrs. Clements and Clements, the plaintiff's attorneys, the sum of $3,000 to compensate them for the professional services rendered by them in this suit in her behalf, to pay immediately to W. W. Colson, Jr., Esquire, the special master to whom the cause was referred, the sum of $650 to compensate him for the services rendered by him as such master, and to pay immediately all other unpaid costs of this suit.

It is further ordered and decreed that the plaintiff's prayers for financial relief, other than that accorded by this decree, be, and they are hereby denied.

The court retains jurisdiction of the cause for the purpose of effectuating and enforcing the terms and provisions of this decree and for the further purpose of entering such other orders and decrees, in the event the parties shall both consent to their entry, as shall be necessary to effect a sale of the real property ·described in the paragraph numbered 5 of the plaintiff's bill of complaint and a distribution of the proceeds of such sale.